*310 TEXTO COMPLETO DE LA SENTENCIA
El 24 de marzo de 2003, Olga Alemán Ojeda presentó Recurso de Apelación y solicitó revocación de la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 21 de enero de 2003 y notificada el 29 de enero de 2003. Mediante dicha sentencia, el tribunal a quo impuso a Alemán Ojeda el pago de $75,000.00 más costas, gastos y honorarios de abogado.
Por los fundamentos que expondremos a continuación, MODIFICAMOS la Sentencia apelada.
I
El 16 de julio de 1996, la Universidad de Puerto Rico (en adelante la Universidad) y Olga Alemán Ojeda (en adelante Alemán Ojeda) suscribieron contrato de arrendamiento por 24 meses sobre el merendero número uno ubicado frente a la facultad de Ciencias Sociales del Recinto Universitario de Río Piedras. Previo a la firma del contrato de arrendamiento entre las partes, Alemán Ojeda, junto a varios funcionarios de la Universidad, acudieron a inspeccionar el merendero, el cual estaba en estado de deterioro debido a que había permanecido cerrado por algún tiempo. Por lo que la Universidad realizó trabajos para habitarlo y acondicionarlo.
Mientras realizaban las labores de reparación en el merendero, Alemán Ojeda solicitó le proveyeran determinadas instalaciones eléctricas para equipo que ésta deseaba instalar. Alemán Ojeda llevó el equipo al merendero y éste fue instalado. En una de las visitas realizadas al merendero por el Director del Departamento de Facilidades Universitarias del Recinto de Río Piedras, Ledo. Luis A. Rivera Rivera, para verificar los trabajos de reparación, éste notó la presencia del equipo y estimó que Alemán Ojeda había tomado posesión del local, por lo que ordenó a los trabajadores cesar los trabajos y retirarse del merendero. Hasta ese momento faltaban de instalar las luminarias.
Alemán Ojeda comenzó a operar el merendero y envió varias cartas a la Universidad para notificar que estaba sufriendo descargas eléctricas y que los enchufes del merendero se estaban quemando. El 31 de octubre de 1996, el Director Auxiliar de la División de Electricidad del Departamento de Facilidades Universitarias del Recinto de Río Piedras, Sr. Heriberto Ramos, inspeccionó las instalaciones eléctricas del merendero e indicó que había un “multiplug” instalado al pie de un fregadero y cables sin protección subiendo por el techo, en violación al Código Nacional de Electricidad. El señor Ramos señaló que dichas instalaciones no fueron realizadas por su personal ni se le había solicitado autorización para realizarlas.
El 27 de noviembre de 1996, varios funcionarios de la Universidad realizaron otra inspección al merendero y el informe rendido en esa ocasión por el Ingeniero Orlando Ruiz Rivera, Jefe de la División de Electricidad del Departamento de Facilidades Universitarias, reveló la presencia de tostadora de tipo industrial conectada mediante extensiones caseras a uno de los receptáculos del techo, los cuales fueron habilitados originalmente para conectar las neveras. Ese mismo equipo había sido conectado en diferentes lugares, quemando todos los receptáculos. Dicha conexión fue realizada con conector inapropiado para la capacidad del equipo, lo cual explicaba el que se calentara la extensión y quemara los receptáculos de la pared. También encontró la conexión de un extractor a cable pelado e insertado en los huecos de una extensión de múltiples salidas tipo barra o “multiplug”; conexión eléctrica entre una nevera y su compresor, este último ubicado en el techo del local, conectado a cable abierto sin conducto o tubo que protegiera los mismos; y uno de los receptáculos tipo “ground fault’, el cual había sido instalado originalmente por la brigada de la Universidad y fue removido posteriormente y ubicado cerca de un fregadero, variando la protección de los equipos conectados y violando los códigos de electricidad. El personal de la Universidad le requirió a Alemán Ojeda que contratara un perito electricista para corregir dichas deficiencias y le concedió un término de cinco días para ello. Alemán Ojeda solicitó prórroga de dos días adicionales al plazo notificado para corregir las fallas. Una vez vencido dicho *311 término, Alemán Ojeda no había corregido las faltas señaladas y el 13 diciembre de 1996, el Rector del Recinto Universitario de Río Piedras, Dr. Efraín González Tejera, notificó por escrito que daba por terminado el contrato y que procediera de inmediato a sacar sus pertenencias y entregar la llave del merendero.
El 27 de diciembre de 1996, Alemán Ojeda presentó Demanda por incumplimiento de contrato contra la Universidad de Puerto Rico por dejar de reparar y mejorar las facilidades arrendadas, caso civil número 96-14663. Alemán Ojeda alegó que correspondía a la Universidad realizar los trabajos de electricidad. El 11 de septiembre de 1997, el Tribunal de Primera Instancia emitió sentencia, la cual fue notificada el 15 de septiembre de 1997, en la que desestimó la demanda al concluir que el contrato de arrendamiento no imponía obligación a la Universidad de realizar reparaciones y mejoras al merendero. Por el contrario, imponía expresamente dicha responsabibdad a la arrendataria, previa autorización del recinto.
El 23 de enero de 1998, la Universidad de Puerto Rico presentó Demanda en cobro de dinero contra Alemán Ojeda, en la que alegó lo siguiente: (1) el 16 de julio de 1996, las partes suscribieron contrato de arrendamiento sobre el merendero número uno ubicado frente a la Facultad de Ciencias Sociales del Recinto de Río Piedras, con vigencia hasta el 15 de julio de 1998; (2) por razón de que Alemán Ojeda incurrió en violaciones al contrato, el 13 de diciembre de 1996, el Rector del Recinto Universitario de Río Piedras notificó a ésta sobre la terminación del contrato amparado en el inciso 10 de la cláusula 19 del mismo; y (3) Alemán Ojeda se negó a abandonar el local, motivo por el cual la Universidad incoó acción de desahucio en su contra y reclamó compensación no menor de $50,100.00 por gastos y honorarios de abogado más penalidad de $100.00 por cada día que se demore la demandada en desalojar el merendero, más los cánones de arrendamiento estipulados en el contrato.
El 17 de febrero de 1998, Alemán Ojeda presentó contestación a la demanda y adujo que: la Universidad incumplió con sus obligaciones, los trabajos realizados por ésta en el merendero fueron defectuosos e incompletos; la Universidad renunció a cualquier causa de acción sobre cobro de dinero al dejar de presentar reconvención compulsoria en el caso civil número 96-14663, y haber fraccionado ilegalmente cualquier causa de acción que pudiese tener por cobro de dinero. Alemán Ojeda también presentó reconvención y alegó lo siguiente: (1) la Universidad está obligada a resarcir los daños ocasionados por acelerar el término de expiración del contrato en una suma no menor de $25,000.00; (2) el 25 de septiembre de 1997, sufrió caída en el área de estacionamiento de los merenderos debido a pedazo de tubo que sobresalía del pavimento causándole daños físicos y emocionales estimados en una suma no menor de $25,000.00; (3) la Universidad mantiene el área de los merenderos en situación deplorable en la cual existe invasión de abejas que la atacaron, ocasionándole dolores intensos por las picaduras y dichos daños fueron estimados en una suman no menor de $5,000.00; (4) la Universidad es responsable tanto por el tubo que fue cortado y dejado en el pavimento como por la invasión de las abejas, ya que tenía conocimiento sobre esto e hizo caso omiso al respecto; (5) el sistema eléctrico instalado por la Universidad en el merendero es defectuoso, lo que provocó el haber experimentado varias descargas eléctricas, causándole daños físicos y emocionales en una suma no menor de $10,000.00; y (6) la Universidad incumplió con los términos acordados en el contrato al permitir que otros operarios vendan el mismo menú que ésta ofrece y debido a esto dejó de devengar una cantidad no menor de $15,000.00. En síntesis, Alemán Ojeda reclamó una cantidad mínima de $80,000.00 por los daños ocasionados más $10,000.00 de costas y honorarios de abogado.
El 27 de febrero de 1998, la Universidad de Puerto Rico presentó contestación a la reconvención y adujo que los daños sufridos por Alemán Ojeda fueron resultado de sus propias acciones o debido al incumplimiento de sus responsabilidades y solicitó la desestimación de la misma, más emitir sentencia sumaria a su favor.
El 23 de mayo de 2000, Alemán Ojeda entregó posesión del merendero y el 14 de junio de 2000, enmendó su contestación a la demanda para alegar la nulidad del contrato de arrendamiento. Dicha enmienda fue aceptada por el tribunal el 3 de julio de 2001.
*312 El 22 de noviembre de 2002, fue celebrada la vista en su fondo, a la cual Alemán Ojeda no compareció y ante tal incomparecencia, el tribunal decidió eliminar sus alegaciones.
El 21 de enero de 2003, el Tribunal de Primera Instancia emitió sentencia, notificada el 29 de enero de 2003, en la que determinó lo siguiente: (1) el contrato de arrendamiento claramente estipula que corresponde a la parte arrendataria, adquirir e instalar el equipo necesario para la operación del merendero y realizar las reparaciones, mejoras o modificaciones necesarias luego de obtener la autorización escrita del recinto; (2) la prueba presentada estableció de manera fehaciente que la parte demandada, sin autorización previa de la Universidad, de manera negligente alteró las instalaciones eléctricas e improvisó conexiones en violación del Código Eléctrico Nacional, causando que se quemaran los enchufes y creando riesgo de fuego o electrocución; (3) a pesar de los requerimientos de la parte demandante, la demandada no corrigió las deficiencias creadas por ella misma; (4) el contrato impone penalidad específica para cuando sea necesario requerir el desalojo de la arrendataria y ésta rehúse desocupar el local, el pago de una suma igual a tres veces el canon de arrendamiento correspondiente por cada mes o fracción de mes que retenga la posesión de la propiedad; (5) el contrato también impone penalidad aplicable a aquellos casos en que la Universidad tenga que acudir a los tribunales a solicitar el desahucio de $2,000.00 de honorarios de abogado más $100.00 por cada día que se demore el desalojo; (6) el 13 de diciembre de 1996, la Universidad requirió a Alemán Ojeda la entrega del merendero y ésta lo desocupó el 23 de mayo de 2000, por lo que la penalidad impuesta de $1,500.00 mensuales durante un término de 41 meses suma un total de $61,500.00; (7) la demandada permaneció en posesión del merendero durante 1,257 días a partir de la fecha en que se le requirió el desalojo, a razón de $100.00 diarios, equivaldría a un total de $125,700.00, que sumados a $61,500.00, producen un gran total de $187,200.00; y por último, (8) la Universidad optó por instar acción ordinaria dos años después de haber notificado la resolución del contrato y no litigó dicho asunto dentro del pleito presentado por la parte demandada el 13 de septiembre de 1996, caso civil número 96-14663. El Tribunal de Primera Instancia, considerando la inacción desplegada por la Universidad y la doctrina de equidad, modificó la pena e impuso a la parte demandada el pago de $75,000.00 más costas, gastos y $2,000.00 de honorarios de abogados.
El 7 de febrero de 2003, Alemán Ojeda presentó moción en solicitud de determinaciones de hechos adicionales y reconsideración. Ambas solicitudes fueron declaradas No Ha Lugar mediante resolución emitida el 18 de febrero de 2003 y notificada el 21 de febrero de 2003.
Inconforme con dicha determinación, el 24 de marzo de 2003, Alemán Ojeda acudió ante nos mediante recurso de apelación y solicitó revocación de la sentencia emitida por el Tribunal de Primera Instancia a quien imputa la comisión de los siguientes tres errores:

“1. Erró el tribunal apelado al emitir sentencia sin prueba de deuda por concepto de cánones o penalidad a la fecha del juicio.

2. Erró el tribunal apelado al no reconocer que la parte demandante renunció a la causa de acción sobre cobro de dinero al dejar de presentar reconvención compulsoria en el caso civil núm. 96-14663 ante el Tribunal de Primera Instancia.

3. Erró el tribunal apelado al no decretar la nulidad del contrato de arrendamiento. ”

II
Por estar íntimamente relacionados, discutiremos los errores uno y tres en conjunto.
Los contratos son fuente de obligación, la cual queda perfeccionada desde que las partes contratantes consienten voluntariamente a cumplir con los términos de los mismos. Estos existen desde que una o varias personas consienten en obligarse a dar alguna cosa, o a prestar algún servicio, Artículo 1206 del Código Civil, *313 31 L.P.R.A. Sección 3371; Amador v. Cone. IGL. Univ. de Jesucristo, 150 D.P.R. 571, 581 (2000).
No hay contrato sino concurren el consentimiento de los contratantes, el objeto cierto materia del contrato y la causa de la obligación establecida, Artículo 1213 del Código Civil, 31 L.P.R.A. Sección 3391. La falta de uno de estos requisitos esenciales para la validez del contrato da lugar a su inexistencia, Logia Caballeros del Plata v. García, 63 D.P.R. 291, 295-296 (1944).
“Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público, ” Artículo 1207 del Código Civil, 31 L.P.R.A. Sección 3372. Una vez concurren las condiciones esenciales para su validez, los contratos son obligatorios y las obligaciones que nacen de los contratos tienen fuerza de ley entre las paites contratantes, y deben cumplirse al tenor de los mismos, Artículos 1044 y 1230 del Código Civil, 31 L.P.R.A. Sección 2994 y Sección 3451. De conformidad con el principio rector de pacta sunt servanda, las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia que según su naturaleza sea conforme a la buena fe, al uso y a la ley, Artículo 1210 del Código Civil, 31 L.P.R.A. Sección 3375.
Los contratos recogen la voluntad de los contratantes y los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obbgó a hacer mediante contrato cuando dicho contrato es legal y válido, y no contiene vicio alguno, De Jesús González v. A.C., 148 D.P.R. 255, 271 (1999). La norma reiterada es que todo contrato constituye la ley entre las partes, siempre y cuando concurran las condiciones indispensables para su validez.
En el caso ante nuestra consideración, estamos ante un contrato válido de arrendamiento. Así lo determinó el Tribunal de Primera Instancia luego de aquilatar la prueba documental y testifical presentada y conferir la credibilidad que le mereció. No surge del récord ningún indicio de pasión, prejuicio, parcialidad o error manifiesto que de margen a la intervención de este Tribunal con la apreciación de la prueba realizada por el foro apelado. Por tanto, no intervendremos con la apreciación del tribunal.
Nuestro Código Civil define el arrendamiento de cosas como un contrato mediante el cual una de las partes se obliga a ceder a la otra el disfrute o uso de una cosa por tiempo determinado a cambio de un precio cierto, Artículo 1433 del Código Civil, 31 L.P.R.A. Sección 4012. En este caso en particular, la Universidad de Puerto Rico cedió a Alemán Ojeda el uso y disfrute del merendero número uno para que ésta lo trabajara vendiendo alimentos vegetarianos durante dos años a cambio de un canon de arrendamiento de $500.00 mensuales.
Las cláusulas del contrato de arrendamiento que nos atañen son las siguientes:

“SÉPTIMA: MODIFICACIONES EN LAS FACILIDADES: La SEGUNDA PARTE hará las adiciones, alteraciones, mejoras o modificaciones necesarias a las instalaciones arrendadas luego de obtener autorización escrita del RECINTO. En caso de emergencia súbita, que requiera una modificación o alteración necesaria e inmediata para continuar la prestación de los servicios, la SEGUNDA PARTE gestionará y obtendrá, por la vía más rápida, la previa autorización del RECINTO para realizar la misma.

DECIMONOVENA: Se incorporan como parte de este Contrato, las siguientes cláusulas uniformes de contratación requeridas por normas establecidas por el Presidente de la Universidad de Puerto Rico, las cuales aplicarán a este Contrato en todo lo que sea pertinente:

... 10. DE CANCELACIÓN: El RECINTO podrá resolver y dar por terminado este Contrato mediante notificación con diez (10) días de antelación a la fecha de la resolución y terminación. Además, el RECINTO podrá cancelar el Contrato de forma inmediata sin previo aviso cuando la parte contratada incurra en negligencia, incumplimiento o violación de alguna condición de este Contrato.

*314
VIGÉSIMA: VIGENCIA: Este contrato estará vigente desde el 16 de julio de 1996 hasta el 15 de julio de 1998.

-Podrá resolverse y darse por terminado mediante notificación escrita de cualquiera de las partes con veinte (20) días de antelación. Si al terminar este Contrato, la SEGUNDA PARTE permanece en el uso y disfrute del Merendero, se entenderá que el arrendamiento continúa sólo de mes a mes, según las disposiciones del Artículo 1456 del Código Civil (31 L.P.R.A., See. 4063).

-De optar el RECINTO por resolver y dar por terminado el presente Contrato o del RECINTO no interesar renovarlo a su terminación, la SEGUNDA PARTE, de ser requerido para ello, removerá el equipo de su propiedad y desalojará las instalaciones que ocupa en un término no mayor de veinte (20) días, contados a partir del requerimiento o terminación, por los cuales pagará la renta correspondiente. Transcurridos esos veinte (20) días, la SEGUNDA PARTE entregará las llaves y la posesión de la propiedad arrendada al RECINTO en la oficina designada para el pago de los cánones de arrendamiento. En caso que la SEGUNDA PARTE no entregue las llaves y la posesión de la propiedad arrendada a su vencimiento o resolución de este Contrato, se compromete a pagar una suma igual a tres (3) veces el canon de arrendamiento correspondiente, por cada mes o fracción de mes que retenga la posesión de la propiedad después del vencimiento o resolución del Contrato.

VIGESIMAPRIMERA: El incumplimiento de cualquiera de las cláusulas de este Contrato será motivo suficiente para que el RECINTO pueda resolverlo y cobrar los cánones de arrendamiento hasta su expiración.

-Del RECINTO verse obligado a acudir a los Tribunales para obligar a la SEGUNDA PARTE a desalojar la propiedad que ocupa o de la SEGUNDA PARTE demandar al RECINTO y/o sus funcionarios para tratar de evitar el eventual desalojo y/o terminación del Contrato, la SEGUNDA PARTE se obliga a pagar al RECINTO los gastos en que éste incurra. Las partes estipulan que dichos gastos serán la cantidad de dos mil dólares ($2,000) en concepto de honorarios de abogado, cuya suma advendrá líquida y exigible con la mera radicación de la demanda y cien dólares ($100) por cada día que se demore el desalojo de las instalaciones como consecuencia de la acción jurídica. La fecha del desalojo será la fecha en que el RECINTO lo haya requerido y los cien dólares ($100) diarios se cobrarán por cada día que la SEGUNDA PARTE permanezca en dichas instalaciones físicas después de la fecha requerida por el RECINTO, aun cuando no se haya instado acción judicial alguna.”

Al interpretar un contrato, los tribunales debemos atender, principal y especialmente, la voluntad de los contratantes, ya que es la intención de las partes lo que determina el alcance de las obligaciones contractuales. Tampoco debemos perder de vista las consecuencias prácticas y el resultado final de la eficaz operación de sus prestaciones. El mandato estricto del Artículo 1233 del Código Civil, 31 L.P.R.A. Sección 3471, obliga a los tribunales a tenerse al sentido literal de los términos del contrato cuando éstos no dejan lugar a dudas sobre la intención de los contratantes y, en este caso, los términos del contrato son claros. No hay duda que en el contrato se le impone a la arrendataria el deber de realizar las mejoras necesarias en la propiedad arrendada. Además, las partes pactaron cláusula penal en caso de incumplimiento. El contrato claramente establece penalidad específica para el eventual incumplimiento de la parte arrendataria con los términos del mismo.
La Universidad concedió un término de siete días a la arrendataria para que hiciera las reparaciones en el sistema eléctrico del merendero. Al vencer dicho término sin que ésta hubiera realizado dichas mejoras, la Universidad solicitó que desalojara el merendero el 13 de diciembre de 1996. Por lo que, según los términos del contrato, Alemán Ojeda tenía 20 días para desalojar la propiedad. A partir de esos 20 días, Alemán Ojeda tenía que pagar $1,500.00 mensuales hasta el eventual desalojo del merendero, el 23 de mayo de 2000. Desde enero del 1997 hasta mayo del 2000 transcurrieron 41 meses, a razón de $1,500.00 mensuales son $61,500.00, más la penalidad de los $100.00 diarios, nos da un total de $187,200.00, según calculó el tribunal sentenciador.
*315 Nuestro ordenamiento jurídico en materia de contratos reconoce las obligaciones con cláusula penal, R.C. Leasing Corp. v. Williams Int. Ltd., 103 D.P.R. 163, 168 (1974). Esta figura jurídica proviene del derecho romano y consiste en garantía del derecho de crédito, D.E. Espín, La cláusula penal en las obligaciones contractuales, 30 Rev. Der. Priv. 145, 146 (1946). La doctrina la ha definido como “estipulación de carácter accesorio, establecida en un contrato, con la finalidad de asegurar el cumplimiento de la obligación principal, en virtud de la que el deudor de la prestación que se trata de garantizar viene obligado a pagar por lo general determinada cantidad de dinero, ” Levitt & Sons of P.R., Inc. v. D.A.C.O., 105 D.P:R. 184, 193 (1976).
Los efectos de la cláusula penal sólo se producen cuando incumplimos con la obligación principal. El incumplimiento total, parcial, defectuoso o tardío por parte del obligado es la conditio inris que provoca la eficacia de la cláusula penal. El sólo hecho del incumplimiento implica que la pena ha de pagarse y tal incumplimiento debe ser por causa imputable al deudor, José Puig Brutau, Fundamentos de Derecho Civil, 4ta. Ed., Tomo 1, Volumen 2, Barcelona, Bosch, 1988, a las páginas 451-452. No obstante, el Código Civil le impide tanto al deudor eximirse de cumplir la obligación pagando la pena como al acreedor exigir conjuntamente el cumplimiento de la obligación y la satisfacción de la pena, excepto en aquellos casos en que se les haya otorgado expresamente ese poder, Artículo 1107 del Código Civil, 31 L.P.R.A. Sección 3132.
La cláusula penal cumple importantes funciones, tiene un fin coercitivo, punitivo y liquidador de los daños y perjuicios que represente. Por esa función de apremio o estímulo al cumplimiento de la obligación asegurada, se le conoce también como cláusula in terrores, José Ramón Vélez Torres, Derecho de Obligaciones, Curso de Derecho Civil, 2da. Ed., San Juan, Facultad de Derecho U.I.P.R., 1997, a las páginas 299-300. En esencia, pactamos una cláusula penal para asegurar el cumplimiento de la obligación y para evaluar por anticipado el peijuicio que sufriría el acreedor con el incumplimiento de la obligación por parte del deudor, Jack's Beach Resort, Inc. v. Cía. Turismo, 112 D.P.R. 344, 348-349 (1982); Levitt & Sons of P.R., Inc. v. D.A.C.O., supra, a la página 193; R.C. Leasing Corp. v. Williams Int. Ltd., supra, alas páginas 169-170.
La cláusula penal sustituye por anticipado los daños que puedan surgir, Artículo 106 del Código Civil, 31 L. P.R.A. Sección 3131. Es por ello que el acreedor queda relevado de alegar y probar los daños ocasionados por el incumplimiento y de acreditar la cuantía de los perjuicios, Demas v. Builders Ins. Co., 109 D.P.R. 774, 784 (1980); C.M. & Finance Corp. v. Cooley, 103 D.P.R. 6, 10 (1974). Sujeto a ese principio, se le permite a las paites acordar que “la evaluación de los daños sobrepase la medida real del daño, de forma que este exceso actúe de modo eficaz como presión sobre el deudor para impulsarle al cumplimiento específico de la obligación ante la amenaza de tener que pagar un resarcimiento que exceda del equivalente pecuniario de la prestación a que se obliga, ” R.C. Leasing Corp. v. Williams Int. Ltd., supra, a la página 170.
Precisamente, por este carácter punitivo o sancionador, el alcance de la cláusula penal es interpretado restrictivamente, WRC Props., Inc. v. Santana, 116 D.P.R. 127, 137-138 (1985). La doctrina prevaleciente no postula el antiguo principio de la inmutabilidad de la cláusula penal, sino el principio de la moderación de la pena, Espín, La cláusula penal en las obligaciones contractuales, supra, a la página 162. De conformidad con ese principio fundamental de la moderación de la pena, el Artículo 1108 del Código Civil, 31 L.P.R.A. Sección 3133, le ordena al tribunal modificar “equitativamente la pena cuando la obligación principal hubiera sido en parte o irregularmente cumplida por el deudor.’’ De conformidad con dicho articulo, procede modificar la cláusula penal en solamente dos instancias, éstas son cuando: (i) la obligación garantizada fue parcialmente cumplida; ó (ii) ésta fue cumplida, aunque de manera irregular. En esos dos supuestos, la aplicación de la pena queda sujeta al prudente arbitrio de los tribunales.
De igual forma, queda implícito en la citada disposición estatutaria que cuando el incumplimiento de la prestación es total, no procede la modificación de la pena convenida. El Artículo 1108, supra, no interesa moderar la cláusula penal por el mero hecho de ser alta o excesiva, sino que trata de reducir la pena en proporción a lo que se cumplió de la obligación principal, Manuel Albaladejo García, Comentarios al Código *316 Civil y Compilaciones Fonales, Tomo XV, Volumen 2, Madrid, EDERSA, 1983, a la página 483.
El Artículo 1108 del Código Civil, supra, faculta a los tribunales en su amplitud de remedios, a limitar el derecho inherente de la parte a resolver obligación con cláusula penal y a moderar la pena cuando la desproporción entre la infracción del contrato y la pena convencional es evidente. La clave al momento de atenuar la cláusula penal es observar el peijuicio realmente sufrido, WRC Props., Inc. v. Santana, supra, a la página 138. En proporción a ese perjuicio, deberá reducirse la cuantía de la pena, así se reduce la carga onerosa y punitiva de la cláusula.
Ahora bien, no se trata de eliminar la efectividad de la cláusula penal, sino de modificarla equitativamente con arreglo a las circunstancias que concurran en cada caso. Cualquier norma en contrario, tendría el efecto de incidir con el principio de autonomía contractual. Como señaló el Tribunal Supremo de Puerto Rico en Jacks Beach Resort, Inc. v. Cía. Turismo, supra, a la página 350: “La facultad judicial de moderación debe usarse sólo con gran cautela y notoria justificación. Al resultado de frenar el predominio absoluto de la autonomía de la voluntad, bien moderando los efectos de los contratos, ya limitando su obligatoriedad según normas de buena fe, ha de llegarse únicamente en circunstancias extraordinarias, como medio de templar su excesiva onerosidadpara el obligado, o la desorbitada desproporción. ”
A tenor con el derecho sustantivo discutido anteriormente, en este caso, el foro a quo computó la pena impuesta en el contrato de arrendamiento ($187,200.00) y procedió a moderar el impacto punitivo de la misma a la luz de la situación fáctica objeto de este recurso. El tribunal sentenciador entendió que la cantidad fijada era excesiva o irrazonable y ejerció su facultad moderadora, con arreglo al Artículo 1108 del Código Civil, supra. En el ejercicio de su sana discreción, mitigó el alcance y efecto de la pena y la redujo a $75,000.00.
No obstante, nos parece que aún continúan presentes condiciones de opresión y desproporción en la pena impuesta. Si tomamos en consideración que la Universidad actuó negligentemente al no verificar que los trabajos de reparación y remodelación del merendero habían sido completados antes de entregar posesión del mismo a Alemán Ojeda, tardó más de dos años en tomar algún tipo de acción contra la arrendataria para que ésta desalojara el local y desaprovechó la oportunidad de presentar su reclamación en cobro de dinero y desahucio dentro del caso incoado por la arrendataria en el 1996, caso civil número 96-14663. Su dejadez, negligencia o incuria no pueden ser remuneradas de tal manera. La doctrina de incuria ha sido definida como dejadez o negligencia en el reclamo de un derecho, lo cual en conjunto con el transcurso del tiempo y otras circunstancias que causan peijuicio a la parte adversa, opera como un impedimento en una corte de equidad, Colón Torres v. A.A.A., 143 D.P.R. 119, 124 (1997). El tiempo que dejó transcurrir la Universidad para hacer valer su derecho fue excesivamente largo. Por lo que ajustamos la pena al pago de $50,000.00. Esta nos parece la penalidad más justa en proporción al grado de culpa y a la dimensión del peijuicio ocasionado.
En conclusión, los errores uno y tres señalados por la parte apelante no fueron cometidos.
III
Nuestro ordenamiento procesal civil incorpora la figura de la reconvención compulsoria por conducto de la Regla 11.1 de Procedimiento Civil, 32 L.P.R.A. Apéndice III, la cual literalmente lee como sigue:

“Una alegación contendrá por vía de reconvención cualquier reclamación que la parte que la formula tenga contra cualquier parte adversa al momento de notificar dicha alegación, siempre que surja del acto, omisión o evento que motivó la reclamación de la parte adversa y no requiera para su adjudicación la presencia de terceros sobre quienes el tribunal no pueda adquirir jurisdicción. Sin embargo, no será necesario incluir dicha reclamación mediante reconvención, si al momento de comenzarse el pleito tal reclamación era ya objeto de otro pleito pendiente. ”

*317 Nótese, pues, que el referido precepto procesal impone a una parte la obligación de reconvenir contra otra parte adversa que le esté reclamando. Ello, claro está, en aquella ocasión en que la causa de acción de la parte reconveniente surja del mismo acto, omisión o evento que motivó la reclamación de la parte reconvenida. La lógica de la regla, en esencia, persigue evitar la duplicidad y multiplicación de los litigios. Así, la misma articula un mecanismo procesal dirigido a dilucidar todas las controversias comunes en una sola acción, Neca Mortg. Corp. v. A & W Dev. S.E., 137 D.P.R. 860, 866-867 (1995). Por tal razón, la debemos interpretar a la luz de la Regla 1 de Procedimiento Civil, 32 L.P.R.A. Apéndice HI, que nos señala que los tribunales deben buscar solución “justa, rápida y económica de todo procedimiento. ”
Como corolario de lo anterior, si una reconvención compulsoria no es formulada a tiempo, se renuncia la causa de acción que la motiva. De suerte tal, que se considerarán adjudicados los hechos y reclamaciones en su totalidad. Así, el demandado no podrá presentar reclamación surgida de los mismos hechos o eventos con posterioridad. A tal pretensión, le sería aplicable por analogía, la doctrina de cosa juzgada, en el sentido de que será concluyente en relación a aquellos asuntos que pudieron haber sido planteados y no lo fueron, Neca Mortg. Corp. v. A & W Dev. S.E., supra, a la página 867.
Adviértase por igual, que del propio texto de la regla surge claramente su ámbito de excepción. A saber, cuando: (i) al momento de formular alegación responsiva no ha surgido la causa de acción de dicha parte; (ii) la adjudicación de la reconvención exige la presencia de terceros sobre los cuales el tribunal no puede adquirir jurisdicción; y (iii) al momento de comenzarse el pleito, tal reclamación era ya objeto de otro pleito pendiente.
En síntesis, la Regla 11.1 de Procedimiento Civil, supra, dispone que al presentar su alegación responsiva, una parte debe incluir, por vía de reconvención, cualquier reclamación en contra de la parte demandante que suija del acto, omisión o evento que motivó la presentación de la reclamación original y que no requiera para su adjudicación la presencia de terceros sobre quienes el Tribunal no pueda adquirir jurisdicción. No obstante, en el presente caso, la Universidad nunca llegó a presentar alegación responsiva a la demanda incoada por Alemán Ojeda en el 1996, caso civil número 96-14663. Dicha demanda fue desestimada mediante solicitud de sentencia sumaria presentada por la Universidad sin haber contestado la demanda. Por lo que el planteamiento de la parte apelante carece de méritos. El segundo error señalado no fue cometido.
IV
En atención a lo anteriormente expresado, MODIFICAMOS la Sentencia apelada según discutido en la página 19 de este escrito en lo i'eferente a la cuantía a pagar como consecuencia de la cláusula penal que aplicaba de acuerdo al contrato habido contra las partes. Así modificada, CONFIRMAMOS la misma.
Lo acordó y manda el Tribunal y lo certifica la Secretaria.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones